FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Feb 09, 2026

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| WILLIAM M., obo JENNA L. (deceased),[1]<br><br>Plaintiff,<br><br>v.<br><br>FRANK BISIGNANO, Commissioner of Social Security,<br><br>Defendant. | No.  1:25-cv-3147-EFS<br><br>**ORDER REVERSING THE ALJ'S DENIAL OF BENEFITS, AND REMANDING FOR PARTIAL BENEFITS** |

Plaintiff William M., on behalf of his deceased daughter Jenna L., asks the Court to reverse the Administrative Law Judge's (ALJ) denial of child benefits, disability insurance benefits, and supplemental security income claims. In response, the Commissioner asks the Court

---

[1] For privacy reasons, the plaintiffs' last names are not listed. *See* LCivR 5.2(c). Plaintiff Jenna L., for whom this matter is brought, is referred to as Jenna.

DISPOSITIVE ORDER - 1

to find the ALJ's decision supported by substantial evidence and to affirm the denial of benefits. Because the ALJ failed to fairly and fully consider the observations related to Jenna's co-occurring mental-health disorders during the one-on-one sessions when Jenna was in custody and at residential treatment, the ALJ's decision is not supported by substantial evidence. The matter is remanded for a determination of disability from January 15, 2019, to the date of Jenna's death on August 3, 2022. Child disability benefits are denied because the ALJ's nondisability decision for the period prior to January 15, 2019 (which is after Jenna attained the age of 22), is supported by substantial evidence.

## I.     Background

In January 2021, Jenna filed applications for child disability benefits on the account of her deceased mother, and for Title 2 and Title 16 benefits on her own account.[2] Each application alleged disability beginning March 19, 2018, the day before Jenna turned 22

---

[2] AR 407–43, 446–49.

years old. Jenna had a high school education and from 2015–17 worked as a plastic molder.[3]

The agency denied each of the applications initially and on reconsideration.[4] Thereafter, Jenna requested a hearing with an ALJ.[5] Before a hearing was held, Jenna passed away from a fentanyl overdose on August 3, 2022.[6]

In May 2023, ALJ Timothy Mangrum held a telephonic hearing at which Jenna's representative appeared and a vocational expert testified.[7] Counsel advised that he was trying to contact Jenna's father; the ALJ stated that he would dismiss the Title 2 claim if a substituted party was not before him within sixty days.[8]

---

[3] AR 27, 478–92.

[4] AR 141–49, 152–58.

[5] AR 160–61.

[6] AR 1334.

[7] AR 45–53.

[8] AR 47–48.

DISPOSITIVE ORDER - 3

1    Thereafter, Jenna's father was substituted as the party for each

2    of Jenna's applications[9]; and the Washington State Department of

3    Social and Health Services (DSHS) advised it was an interested party

4    in the Title 16 claim based on Jenna receiving state-funded public

5    assistance cash benefits.[10]

6    In August 2023, the ALJ issued a decision denying the

7    applications, finding that Plaintiff's depressive disorder, schizoaffective

8    disorder, and substance use disorder did not significantly limit her

9    ability to perform work-related activities for twelve months.[11] Later,

10    the Appeals Council vacated the ALJ's decision and remanded the

11    matter for the ALJ to re-evaluate step two and to consider whether

12    drug addiction was a contributing factor to a determination of

13    disability.[12]

---

16    [9] AR 555.

17    [10] AR 196.

18    [11] AR 112–18.

19    [12] AR 126–28.

A second telephonic hearing with ALJ Mangrum was held in December 2024.[13] Jenna's father and a vocational expert testified. Jenna's father testified that Jenna heard voices and experienced anxiety and paranoia independent of her drug use, and that her drug use—along with cessation of counseling and medication—made her mental health worse.[14]

After the hearing, the ALJ issued a decision denying benefits,[15] finding:

---

[13] AR 54–82.

[14] AR 65–66.

[15] AR 14–44. Per 20 C.F.R. §§ 404.1520(a)–(g), 416.920(a)–(g), a five-step evaluation determines whether a claimant is disabled. *See also* 20 C.F.R. § 404.350(a)(5) (providing for payment of disabled child's insurance benefits if the claimant was 18 years old or older and has a disability that began before attaining age 22). If there is medical evidence of drug or alcohol addiction, the ALJ must then determine whether substance use is a material factor contributing to the

- Jenna had not attained age 22 as of March 19, 2018, the alleged onset date.

- Step one: Jenna had not engaged in substantial gainful activity after March 19, 2018.

- Step two: Jenna had the following medically determinable severe impairments: schizophrenia, depressive disorder, and anxiety disorder.

- Step three: Both with and without substance use, Jenna did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: When considering Jenna's substance use disorder, Jenna had the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations:

  the claimant was capable of performing simple, routine work; could have had frequent interaction with the public and coworkers; her productivity would have been reduced by 20 percent; and would have had

disability. 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. §§ 404.1535, 416.935; *Sousa v. Callahan*, 143 F.3d 1240, 1245 (9th Cir. 1998).

DISPOSITIVE ORDER - 6

unexcused absences of 2 per month on a sustained
basis.

- RFC: When excluding Jenna's substance use disorder, Jenna had the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations:

    the claimant was capable of performing simple, routine work; was capable of frequent interaction with the public and coworkers; and productivity would be reduced by 10 percent on a sustained basis.

- Step four: Jenna was unable to perform past relevant work.

- Step five: when excluding the effects of substance use, and considering Jenna's RFC, age, education, and work history, Jenna could have performed work that existed in significant numbers in the national economy, such as power screwdriver operator; cleaner, housekeeping; and assembler, small products II.[16]

Plaintiff timely requested review of the ALJ's decision by the Appeals Council and now this Court.[17]

---

[16] AR 17–37.

[17] AR 1–6; ECF No. 1.

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error" and such error impacted the nondisability determination.[18] "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[19] The court looks to the entire record to determine if substantial evidence supports the ALJ's findings.[20]

---

[18] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g); *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error— one that is "inconsequential to the ultimate nondisability determination").

[19] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[20] *Kaufmann v. Kijakazi*, 32 F4th 843, 851 (9th Cir. 2022). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (requiring

# III.   Analysis

Plaintiff argues the ALJ erred by finding Jenna's use of drugs material to the disability determination and by improperly rejecting the medical opinion of Dr. Thomas Genthe. In contrast, the Commissioner argues the ALJ's findings are supported by substantial evidence. As is explained below, the ALJ failed to fully and fairly consider the evidence during the periods that Jenna was in custody and at residential treatment. As a result, the ALJ's finding that Jenna's drug use was a material contributing factor to her disability and the ALJ's evaluation of Dr. Genthe's medical opinion are not supported by substantial evidence.

## A.   Drug Use: Plaintiff establishes consequential error.

Jenna struggled with substance use. The ALJ found that Jenna's substance use was material to the finding of disability because "[t]he

---

the court to consider the entire record, not simply the evidence cited by the ALJ or the parties) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

1    record, considered as a whole, shows improvement in the claimant's

2    mental health condition and increased functioning when she was not

3    using substances."[21] The ALJ found that if Jenna abstained from

4    substance use, she would only be off task 10 percent of the workday;

5    whereas, the ALJ found that Jenna, when using drugs, would be off

6    task 20 percent of the workday and absent at least 2 days per month.[22]

7    Therefore, the ALJ found that Jenna failed to establish that her

8    substance use was not a material factor contributing to her disability.[23]

9        Plaintiff does not contest that Jenna's mental-health symptoms

10    were not as severe during the periods she did not use substances and

11    she took her medications, but Plaintiff maintains that, even when

12    Jenna was not using substances and she took her medications, she was

13    unable to sustain fulltime employment given her paranoia,

14    hallucinations, anxiety, and other mental-health symptoms that still

15    _____

16    [21] AR 31. *See also* 20 C.F.R. §§ 404.1535, 416.935; *Sousa*, 143 F.3d at

17    1245; Soc. Sec. Rlg. 13-2p.

18    [22] AR 22, 30.

19    [23] AR 31, 34.

waxed during periods of sobriety and treatment at inpatient facilities. The Court agrees the ALJ erred by finding that Jenna's substance use was a contributing factor material to the determination that Jenna was disabled.

Critically, the ALJ did not discuss the abnormal mental-health observations during the medication-management sessions and individual therapy sessions when Jenna was at residential treatment in the winter of 2021, and instead the ALJ focused on the checked "unremarkable" boxes in the group therapy records.[24] To appreciate the impact of the ALJ's failure to discuss the observed waxing symptoms during Jenna's one-on-one sessions the winter of 2021, a discussion of Jenna's arrest in 2019 and subsequent competency evaluation at Eastern State Hospital is also needed.

On January 15, 2019, Jenna was booked into Yakima County Jail for theft charges.[25] She was observed to be "very paranoid and delusional on booking with auditory hallucinations and actively

---

[24] AR 21, 24, 29.

[25] AR 683.

responding to internal stimuli."[26] More than a month later, on February 27, 2019, Dr. Nathan Henry conducted a forensic evaluation, diagnosing Jenna with an unspecified psychotic disorder and noting that she did not have the capacity to understand the proceedings against her or assist in her defense.[27] Dr. Henry observed that Jenna appeared to respond to hallucinations during the interview, she moved her mouth and spoke in a low tone that was unintelligible at times, although she was linear and logical in her thoughts, and Jenna endorsed auditory hallucinations for the past year and reported that at times she felt that someone was recording or watching her.[28] The Yakima County Superior Court sent Jenna to Eastern State Hospital for a competency evaluation.[29]

On May 14, 2019, a competency evaluation was conducted by Andy Sands, MD, as part of her admittance to Eastern State Hospital.

---

[26] AR 685.

[27] AR 685.

[28] AR 685.

[29] AR 694.

Jenna was friendly, cooperative, polite, and tidy in appearance, with a variable and responsive affect.[30] She appeared distracted during serial 7s, which she did not successfully calculate; and she recalled 3 out of 3 items immediately and 2 out of 3 items on recent recall. Dr. Sands found "[o]verall, her insight, judgment, and impulse control are poor and affected by her psychotic state and facing legal charges."[31] Dr. Sands opined that Jenna's "overall psychiatric prognosis is poor because of chronic mental illness with ongoing psychosis and facing legal charges."[32]

A week later at Eastern State Hospital, Christy Kelsey, MSW, prepared a psychosocial clinical formulation.[33] Jenna was cooperative with blunted affect and relaxed mood, and she reported feeling anxious and that people were watching her and she endorsed daily auditory

---

[30] AR 687.

[31] AR 687.

[32] AR 688.

[33] AR 696–98.

hallucinations, paranoia, and difficulty sleeping.[34] On June 20, 2019, Jenna was discharged back to Yakima County Jail after staying at Eastern State Hospital for 37 days; she was prescribed Abilify, propranolol, and Zoloft .[35] On discharge from Eastern, Jenna was cooperative, euthymic, and mildly anxious, and she denied auditory and visual hallucinations.[36]

Four days later, while at jail, Jenna met with a Comprehensive Healthcare employee to discuss plans upon discharge from jail.[37] Two days later, she met again with this individual, but was handcuffed during this meeting because she had been involved in a fight due to bothering someone with her loudness.[38]

Subsequent records establish that Jenna resumed using drugs after she was released from Yakima County Jail. In November 2020,

---

[34] AR 697–98.

[35] AR 682–83.

[36] AR 684.

[37] AR 1068.

[38] AR 1069.

1  Jenna was screened by the Department of Corrections (DOC) for a

2  DOC violation.[39] A mental health progress note a few days later

3  mentions that Jenna was seen "rocking back and forth and talking very

4  fast," she reported hearing voices, she endorsed paranoia, and her

5  mood was anxious with affect congruent to content.[40]

6      At a session a week later, Jenna's stream of thought was clear

7  and coherent with no disturbances in thought process, speech was

8  within normal limits, mood was dysthymic and affect congruent, and

9  she did not appear to be responding to any internal stimuli and was

10  able to stay on topic.[41] In mid-December, Jenna was released from jail

11  to residential substance abuse treatment at Pathways.[42] Within the

12  week, Jenna had a medication-management appointment with Laura

13  King, PharmD.[43] During the appointment, Jenna rocked back and forth

---

15  [39] AR 717–20.

16  [40] AR 730.

17  [41] AR 725.

18  [42] AR 727.

19  [43] AR 845–52.

in her chair and bounced her legs.[44] Abilify was increased to assist with

Plaintiff's audio hallucinations, visual hallucinations, olfactory

hallucinations, paranoid thoughts, and mood stability.[45] Risperidone

was prescribed to further help with hallucinations, and hydroxyzine

prescribed to lower Plaintiff's social anxiety.

Jenna began group therapy at Pathways for substance abuse. The

group therapy records note via checked boxes that Plaintiff's

mood/affect, thought process/orientation, behavior/functioning, medical

condition, and substance abuse were "unremarkable" and that she was

in a good mood.[46] In addition to the group therapy sessions, Jenna

began individual therapy while at Pathways. Jenna's individual

therapy records also had the "unremarkable" box checked for

mood/affect, thought process/orientation, behavior/functioning, medical

condition, and substance abuse, but the individual therapy records also

---

[44] AR 846.

[45] AR 846.

[46] *See, e.g.*, AR 29, 33.

contain personalized observations and findings.[47] For instance, the

January 14, 2021 individual therapy note states:

> Jenna continues to make progress in coping with her anxiety and depression but expresses some confusion and symptoms of anxiety (shaky voice, rapid speech, body movements, diminished ability to express thoughts clearly), and at times overthinking her discharge plans which are not in the immediate future. Jenna presents as being in a "plan every detail" of her life moving forward and will discuss with one Pathways staff member a detail about her next step, and then immediately go into another discussion with a different staff member about the same subject at the same intensity over the same issues as if it were not already discussed.[48]

The same day as this individual therapy session, Jenna had

another medication-management appointment with Dr. King.[49] Jenna

reported that she was feeling better and that her crying spells had

decreased, but she was still having issues with depression, anxiety,

obsessions, compulsions, getting upset, having paranoid thoughts, daily

_____

[47] AR 933–34

[48] AR 934.

[49] AR 935–45. *See also* AR 845–52.

panic attacks, and audio hallucinations, although they were quieter.[50] Jenna was observed as restless, hyperverbal, and distractable, with a rapid and quivering voice, an anxious mood, an anxious and blunted/flat affect, hopelessness, poor attention span, racing thoughts, flight of ideas, and thoughts that were delusional/paranoid.[51] Dr. King again increased Abilify and sertraline to help with Jenna's symptoms of psychosis and depression/anxiety.[52] The hydroxyzine was stopped and clonidine was added to help with anxiety, and prazosin was added to help with nightmares.[53]

Two weeks after the January medication-management appointment and the individual therapy session, Plaintiff had a psychological evaluation with Thomas Genthe, PhD, at the request of the DSHS.[54] Dr. Genthe did not review any records, and the evaluation

---

[50] AR 936.

[51] AR 939–43.

[52] AR 936.

[53] AR 936.

[54] AR 824–32.

1  included a clinical interview and mental status examination.

2  Dr. Genthe noted that Jenna's speech was at a normal rate and she

3  answered questions with an appropriate amount of detail; she was

4  open, cooperative, and friendly; her reality testing was moderately

5  impaired as evidenced by delusional/paranoid thinking; she presented

6  with a history of depression and anxiety; her thoughts were somewhat

7  disorganized; she was oriented; her immediate recall was normal but

8  she was only able to recall 2 of 4 objects after a 5-minute delay; and she

9  had significant difficulties following the conversation.[55] Dr. Genthe

10  found her level of understanding about the factors contributing to her

11  illness fair and her level of understanding of actions affecting

12  consequences poor, while her level of understanding for the need to

13  comply with treatment was good.[56]

14      The next day, Jenna had another individual therapy session.[57]

15  Again, "unremarkable" was checked for mood/affect, thought

16  _____

17  [55] AR 830–31.

18  [56] AR 831.

19  [57] AR 990.

1    process/orientation, behavior/functioning, medical condition, and

2    substance abuse. However, the written notes state, "Jenna continues to

3    express anxiety, difficulty sitting still, and diminished self-confidence,

4    but improvements have been noted in each of these areas over the last

5    couple weeks."[58]

6         On February 4, 2021, Jenna met again with Dr. King.[59] Jenna

7    reported improved sleep, fewer nightmares, and toned down paranoid

8    beliefs, but depression remained the same, and she still experienced

9    auditory hallucinations at night and high anxiety.[60] She presented

10   "much more restless/fidgety than during previous appointments."[61] She

11   also presented as hyperverbal with a rapid, quivering voice; anxious

12   mood; blunted/flat and anxious affect; poor attention span; distractible;

13   racing thought process with flight of ideas; and thought content that

14

15   _____

16   [58] AR 993.

17   [59] AR 1015–26.

18   [60] AR 1017.

19   [61] AR 1017.

was delusional, paranoid, lonely, hopeless, helpless, and worthless.[62] Medications were continued as prescribed except risperidone was increased to reduce psychosis, prazosin was increased to reduce nightmares, clonidine was stopped, and buspirone was started for anxiety.[63]

The next day Plaintiff had individual therapy.[64] Again, the "unremarkable" boxes were checked.[65] However, Jenna continued to "express/report anxiety, difficulty thinking/explaining herself clearly, and being preoccupied with sorting out life after treatment at Pathways."[66] Jenna had less anxiety and was observed with appropriate dress, good hygiene, and continued "to complete assignments with improved effort in recent days."[67]

---

[62] AR 1020–21.

[63] AR 1017.

[64] AR 1210–11.

[65] AR 1210.

[66] AR 1211.

[67] AR 1211.

1    A week later, Jenna had another individual therapy session.[68]

2  Again, the "unremarkable" boxes were checked, with more details

3  provided in the written Intervention/Progress section. Jenna was

4  appropriately dressed with good hygiene.[69] She continued "to report

5  anxiety and becoming preoccupied by planning her life following

6  inpatient treatment, but this has been part of her copying strategy for

7  guilt and depressive episodes."[70] She also expressed "difficulty with

8  patience as evidenced by her wanting to live with her sister versus stay

9  at Pathways until other housing can be arranged."[71]

10    Four days after that session, Jenna was discharged from

11  Pathways.[72] Within days of discharge, Jenna had difficulty following

12  through with the steps required for outpatient services. First, she

13  missed an appointment because she did not have a ride; then the next

_____

15  [68] AR 1043–44.

16  [69] AR 1044.

17  [70] AR 1044.

18  [71] AR 1044.

19  [72] AR 1060.

day, she failed to be present when her arranged community-support ride came to pick her up at her residence.[73] She continued to fail to communicate with outpatient treatment for two weeks.[74] Finally, in mid-March 2021, Jenna requested a refill on her medications.[75] In the beginning of April 2021, Jenna worked with community support to complete paperwork to get a replacement social security card and obtain housing; during this meeting, Jenna advised that she had stopped taking her medications the week prior and had started to hear voices and talk to herself.[76]

The next records document a crisis intervention with Jenna in June 2021; Jenna's cognition and memory were impacted by substance use and her urine drug screen was positive for methamphetamine.[77]

_____

[73] AR 1248–49.

[74] AR 1250.

[75] AR 1251–53.

[76] AR 1255.

[77] AR 1257.

In August 2021, Jenna had a psychological evaluation; her friend who she lived with accompanied her.[78] Jenna was observed to be agitated, anxious, fidgeting in her chair, responding to internal stimuli, distracted, and with grossly impaired insight and judgment, poor concentration, poor attention span, disorganized thought process, blocking, delusional and paranoid thoughts, and a poor attitude and not wanting to answer questions.[79] Her friend advised that Jenna refused to shower because she was afraid there were microphones or people watching her in the bathroom.[80] Her friend shared that Jenna at times spoke in a word salad and that some nights she moved around the house.[81] Jenna refused to answer questions about substance use.[82] Mental health medications were re-prescribed.[83]

_____

[78] AR 1307–16.

[79] AR 1307–11.

[80] AR 1307.

[81] AR 1307.

[82] AR 1309.

[83] AR 1313.

Jenna continued to take her medications for at least a month, but in late September 2021, Jenna's friend advised that Jenna had a reaction to one of the medications.[84] The next week, Jenna had a follow-up with Pathways.[85] She reported she was taking her prescribed medications and her anxiety was lower and her mood was improving some although she still reported hearing ego dystonic (intrusive) voices. Her voice was soft with paucity; she was anxious with a congruent, blunted/flat affect; she was distracted and paranoid; her judgment and insight were fair.[86] Her friend advised that Jenna "has a couple of times involuntarily held out one of her arms but then puts it back to a normal position"; the provider wondered whether waxy flexibility—a catatonic symptom—was starting.[87] A trial of Paliperidone was prescribed, along with the prior medications.[88]

---

[84] AR 1317–18.

[85] AR 1318–29.

[86] AR 1322–24.

[87] AR 1320.

[88] AR 1320.

1    In October 2021, Jenna failed to show for a consultative

2  examination requested by DSHS.[89] In November 2021, Jenna's friend

3  called for a crisis intervention because Jenna was becoming "difficult"

4  and suspected that Jenna had relapsed.[90] Jenna was resentful of being

5  approached, defiant, slow in speech, fidgety, she had fair insight and

6  judgment, and intact thought process.[91] Jenna denied using drugs.[92]

7    The next month, a welfare check was requested by Jenna's friend

8  because Jenna had been yelling and using foul language and overall

9  doing worse.[93] Upon arrival, Jenna appeared anxious and somewhat

10  paranoid; her grooming and hygiene were fair; her eye contact was

11  sporadic and speech minimal with latency in responses; her manner

12  was evasive, guarded, and suspicious; and she reported she was taking

13  her medications. She denied using methamphetamine, although the

_____

15  [89] AR 1303.

16  [90] AR 1331.

17  [91] AR 1331.

18  [92] AR 1331.

19  [93] AR 1331–32.

crisis note indicates that labs from late November showed a relapse on methamphetamine; such labs are not part of the administrative record.[94]

Jenna passed away from a fentanyl overdose in August 2022.[95]

Again, it is undisputed that Jenna struggled with substance use and that her mental health declined when she used drugs. However, by focusing on the group therapy records with checked "unremarkable" findings, instead of considering the more individualized records, the ALJ's assessment of the materiality of Jenna's drug use is not supported by substantial evidence. Contrary to the ALJ's finding that there were "largely modest mental status examination findings during residential treatment," the medical records during the court-ordered competency evaluation in 2019 and the medication-management records and individual therapy records during the winter of 2020–01 at Pathways reveal that Jenna still experienced significant mental-health symptoms even when she took her medication and abstained from

---

[94] AR 1332.

[95] AR 1334.

substances.[96] Jenna's improvement in the context of inpatient facilities where life stressors were reduced and where she did not need to worry about housing, transportation, arranging treatment, or interacting with coworkers or the public was not to such an extent to support the ALJ's finding that she could function effectively in a workplace. The evaluations and individual sessions reflect that Jenna was restless and distractible, would become hyper focused on a topic, and her non-immediate recall was limited. Although she improved to some extent while at inpatient treatment, once released she struggled, even when she lived with a friend who was active in overseeing Jenna's

_____

[96] *See Attmore v. Colvin*, 827 F.3d 872, 878 (9th Cir. 2016) ("It is the nature of bipolar disorder that symptoms wax and wane over time."); *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) ("Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.").

medication and seeking community support. Therefore, as both

Dr. Sands and Dr. Genthe opined, even when sober and taking mental-

health medications, Jenna's chronic mental illness severely limited her

thought processes, thereby limiting her ability to perform and sustain

fulltime work. The ALJ's finding otherwise is not supported by

substantial evidence. [97]

**B.    Dr. Genthe's Medical Opinion: Plaintiff establishes consequential error.**

Plaintiff also argues the ALJ erred by rejecting Dr. Genthe's

evaluating opinion that Plaintiff had multiple marked mental

limitations that were not the result of a substantial use disorder and

would continue with sobriety. The Court agrees.

1.    <u>Standard</u>

The ALJ must consider and articulate how persuasive he found

each medical opinion and prior administrative medical finding,

including whether the medical opinion or finding was consistent with

---

[97] As is explained further below, Plaintiff fails to establish that the ALJ erred in denying disability for the period before January 15, 2019.

and supported by the record.[98] The factors for evaluating

persuasiveness include, but are not limited to, supportability,

consistency, relationship with the claimant, and specialization.[99] When

considering the ALJ's findings, the Court is constrained to the reasons

and supporting explanation offered by the ALJ.[100]

2.    Dr. Genthe's Opinions[101]

As mentioned above, Dr. Genthe conducted a psychological

evaluation in January 2021 while Jenna was at Pathways.[102] Based on

the clinical interview and mental status examination, Dr. Genthe

opined that Jenna was:

───────────────

[98] 20 C.F.R. §§ 404.1520c(a)–(c), 416.920c(a)–(c); *Woods v. Kijakazi*, 32

F.4th 785, 792 (9th Cir. 2022).

[99] 20 C.F.R. §§ 404.1520c(c), 416.920c(c)(1)–(5).

[100] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

[101] In addition to Dr. Genthe's opinion, the ALJ found the state agency

psychologist consultants' assessments that there was insufficient

evidence to rate Jenna's functioning as unpersuasive. AR 35.

[102] AR 824–32.

- moderately limited in the abilities to perform routine tasks without special supervision, make simple work-related decisions, ask simple questions or request assistance, and understand, remember, and persist in tasks by following very short and simple instructions.

- markedly limited in the abilities to understand, remember, and persist in tasks by following detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances without special supervision; learn new tasks; adapt to changes in a routine work setting; be aware of normal hazards and take appropriate precautions; communicate and perform effectively in a work setting; maintain appropriate behavior in a work setting; complete a normal workday and workweek without interruptions from psychologically based symptoms; and set realistic goals and plan independently.[103]

---

[103] AR 828.

Dr. Genthe opined these limitations were not primarily the result of a substance use disorder and would persist following sixty days of sobriety.[104] He wrote:

> Based on behavioral observations made, information gained during the clinical interview, she appears to meet DSM-5 criteria for Schizophrenia, Post-Traumatic Stress Disorder, Panic Disorder and Major Depressive Disorder, with anxiety features. At this point, [Jenna]'s panic symptoms are at least moderately well managed, but her other symptoms are not, which are likely to interfere with her ability to initiate or maintain future employment. It is recommended that she be referred for a psychiatric consultation to review her regimen and dosages for effectiveness. Additionally, continued involvement in weekly mental health counseling is highly recommended to address various psychosocial stressors that contribute to her current level of emotional distress. From a psychological perspective, due to the chronic nature of [Jenna]'s symptoms, her prognosis is viewed as poor. It is unlikely that her conditions will improve to the point of her being able to resume normal work activities within the next 12 months. Thus, a referral for SSI track appears warranted and appropriate.[105]

3.    The ALJ's Findings as to Dr. Genthe's Opinion

The ALJ found Dr. Genthe's opined limitations not persuasive because:

---

[104] AR 829.

[105] AR 829.

- "the limitations [were] assessed in a check-box format, and [were] not accompanied by explanation or support."

- his "opinion is not consistent with other evidence of record, including contemporaneous records from residential treatment before and after his assessment that note unremarkable mood, affect, thought process, orientation, and behavior; as well as records from group treatment, where she was an active participant and often noted to be in a good mood, with no evidence of any notable difficulties with interaction or communication."[106]

4.   <u>Analysis</u>

Substantial evidence does not support the ALJ's supportability evaluation. Dr. Genthe offered more than his check-box limitation ratings; he listed his observations and test results and explained that Jenna's conditions were chronic and that her conditions were unlikely to improve within the next twelve months. Dr. Genthe's opined limitations were contained in a check-box portion of what was otherwise a very thorough and detailed narrative report which provided notes from his clinical review, mental status examination results, assessment/diagnosis, and prognosis, as well as treatment

_____

[106] AR 35.

recommendations.[107] While the limitations were set forth in a "check-box format" portion of the report, it is error to take them out of context and not to consider them as a part of the detailed report in its entirety.

Additionally, the ALJ's supportability finding failed to recognize that Dr. Genthe found Jenna's "reality testing was moderately impaired as evidenced by delusional/paranoid thinking," that her "thoughts were somewhat disorganized," and that she "had significant difficulties following the conversation."[108] The ALJ's failure to mention material thought-process deficiencies observed during the evaluation consequently impacted the ALJ's evaluation of Dr. Genthe's opined limitations.[109]

---

[107] AR 824-831.

[108] AR 35, 830–31.

[109] *See Kilpatrick v. Kijakazi*, 35 F.4th 1187, 1193 (9th Cir. 2022 (While an ALJ need not address every piece of evidence, an ALJ "may not ignore significant probative evidence that bears on the disability analysis."); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (recognizing it is improper for an ALJ to "reach a conclusion first, and

In addition, substantial evidence does not support the ALJ's consistency evaluation. The ALJ's consistency evaluation failed to fully and fairly consider the severe abnormal mental-health symptoms noted in the one-on-one treatment records and mental-health evaluations while Jenna was at Pathways, Yakima County Jail, and Eastern State Hospital.

## C.    Remand: for an award of Title 2 and 16 partial benefits.

Plaintiff seeks a remand for payment of benefits. Although remand for further administrative proceedings is the usual course when a harmful error occurs in the administrative proceeding, an award of partial benefits is appropriate on this record, as Jenna has died and there is no need to develop the record as further administrative proceedings would serve no useful purpose.[110]

_____

then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result").

[110] See *Treichler v. Comm'r of Social Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

Jenna establishes disability beginning January 15, 2019, when she was booked into Yakima County Jail and observed to be "very paranoid and delusional . . . with auditory hallucinations and actively responding to internal stimuli."[111] Six weeks later, Dr. Henry also observed Jenna being severely impacted by her hallucinations, paranoia, and anxiety symptoms.[112] Although Jenna mentioned to Dr. Henry, and others after that date, that she experienced auditory and visual hallucinations for the past year,[113] those reports conflict with her prior contemporaneous statements to others, as well as the observed symptoms:

- October 2017: "none" box checked for hallucinations; Jenna reported she felt okay; presented with normal speech, thought process and content; found to not need mental-health services; she was employed; she was charged with a DUI.[114]

---

[111] AR 685.

[112] AR 685.

[113] *See* AR 685, 1066.

[114] AR 1281–82.

- November 2017: reporting stress dealing with a relationship and that her drug use made her anxious, but no reports of hallucinations or paranoia; she presented as anxious but did not appear to be experiencing perceptual disturbances as thought content was intact and no presence of delusional thought content; she was employed at Sea Galley.[115]

- February 2018: "none" box checked for hallucinations; presented with normal thought process, content, and speech; clinician found that Jenna did not need mental-health services; she was not employed, and she was not taking any mental-health medications.[116]

- August 2018: Jenna reporting that her mood was "fine"; "none" box checked for hallucinations; she presented with normal thought content and speech and as clear and alert; she was not employed; she was jailed on failure to appear for a warrant.[117]

---

[115] AR 1268.

[116] AR 1276–80.

[117] AR 1271–73.

1    • October 2018: Jenna did not report any medical conditions to

2        the treatment provider when she was admitted to detox for

3        recent methamphetamine use; she was observed as anxious

4        and with rapid/slurred speech.[118]

5        Given the inconsistency in the records as to when Jenna began

6    experiencing disabling hallucinations, paranoia, and anxiety, Plaintiff

7    fails to establish that the ALJ's denial of disability, on the basis that

8    Jenna's drug use was a material factor contributing to her symptoms,

9    is not supported by substantial evidence for the period before Plaintiff's

10   booking on January 15, 2019. On and after January 15, 2019, the

11   records clearly reflect that, even with medication and sobriety, Jenna's

12   schizophrenia, depressive disorder, and anxiety disorder were of such

13   severity that she was unable to sustain full-time employment.[119]

14   Therefore, provided all other program requirements are met for

15

16   _____

17   [118] AR 1285–90.

18   [119] *See Smith v. Kijakazi*, 14 F.4th 1108, 1113–16 (9th Cir. 2021)

19   (considering when impairments develop, improve, and worsen).

substitution of party, Title 2 and Title 16 benefits are to be paid for the period of January 15, 2019, to August 3, 2022.

Prior to January 15, 2019, substantial evidence, including Jenna's statements to providers and the providers' observations, supports the ALJ's decision that Jenna's drug use was a contributing factor material to her mental-health limitations. Because Jenna attained the age of 22 before disability onset, the ALJ's denial of child benefits is supported by substantial evidence.

## IV.   -Conclusion

The ALJ erred. For Title 2 disability insurance and Title 16 benefits, disability is established for the period January 15, 2019, to August 3, 2022. Child benefits are not awarded.

Accordingly, **IT IS HEREBY ORDERED**:

1.   The ALJ's nondisability decision is **REVERSED, and this matter is REMANDED to the Commissioner of Social Security for immediate calculation and award of benefits** for the disability period of **January 15, 2019, to August 3, 2022,** provided all other program requirements are met for substitution of party.

2.     The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 7 and 9**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 9th day of February 2026.

_Edward F. Shea_
_____
EDWARD F. SHEA
Senior United States District Judge